Joseph **LOMBARDO** and Roy L. **Williams, Petitioners–Appellants,**

v.

**UNITED STATES of America,**
**Respondent–Appellee.**

No. 88–1482.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 28, 1988.

Decided Jan. 12, 1989.

---

Judith Helprin, Chicago, Ill., Bruce C. Houdek, James Millert Houdek Tyrl & Sommers, Kansas City, Mo., for petitioners-appellants.

Gary S. Shapiro, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for respondent-appellee.

Before BAUER, Chief Judge,
CUMMINGS and CUDAHY, Circuit
Judges.

CUMMINGS, Circuit Judge.

■ Defendants Joseph Lombardo and Roy L. Williams, together with three co-defendants, were each convicted in the United States District Court for the Northern District of Illinois of nine counts of wire fraud in violation of 18 U.S.C. § 1343, one count of conspiracy to bribe a United States Senator in violation of 18 U.S.C. § 371, and one count of traveling interstate with the intent to promote bribery in violation of 18 U.S.C. § 1952. Lombardo received an aggregate sentence of 15 years plus substantial fines. In addition to fines, Williams received a ten-year prison term. This Court affirmed the convictions.[1]

Following the 1987 decision of the Supreme Court in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292, defendants returned to the district court to mount a collateral attack on the validity of their convictions pursuant to 28 U.S.C. § 2255. *McNally* reversed an accepted interpretation of mail fraud[2] by the courts in holding that the mail fraud statute contemplates only offenses designed to obtain property rights fraudulently in contrast to schemes depriving the victim of intangible rights. Both the defendants and the United States concede that *McNally* is to be applied retroactively since the defendants' convictions cannot stand if their conduct no longer constitutes criminal activity. *United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988).

Judge Prentice Marshall was the trial judge. After reviewing the indictment, evidence and lengthy instructions given to the jury in their 1982 trial, he denied defendants' motions to vacate their convictions, as well as their motions to reconsider. The court found that the indictment and jury instructions alleged two objectives of the wire fraud scheme in the conjunctive, one involving property rights and the other involving the impermissible intangible rights theory. As a result, the jury was required to find a deprivation of property rights in order to convict the defendants, rendering the intangible rights language mere surplusage. We affirm.

I

Because the defendants are contesting their convictions, we must review all evidence in the light most favorable to the government. *United States v. Bentley*, 825 F.2d 1104, 1107 (7th Cir.1987), certiorari denied, —— U.S. ——, 108 S.Ct. 240, 98 L.Ed.2d 198. Defendants were convicted for their conduct surrounding the sale of a piece of property, known as Wonderworld, located in Las Vegas, Nevada, and owned by the Teamsters Central States Pension

---

**1.** *United States v. Williams*, 737 F.2d 594 (7th Cir.1984), certiorari denied, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377. Subsequent to filing this appeal, defendant Williams was released from incarceration on parole. Both the United States and Williams have, however, stipulated that the release of Williams does not impact on the merits of this appeal given that Williams was in custody when the appeal was filed, thus satisfying the custody requirement of 28 U.S.C.

§ 2255. See *United States v. Payne*, 741 F.2d 887, 890 (7th Cir.1984).

**2.** *McNally* applies with equal force to the wire fraud convictions since the scope of the wire fraud statute is for most purposes coextensive with that of the mail fraud statute. See *United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir. 1987).

Fund ("Pension Fund"). At the time of the sale of the property, defendant Williams was the President of the Central Conference of Teamsters ("Teamsters") while defendant Lombardo's vocational status was "something of a mystery." 737 F.2d at 599. The Wonderworld property was located in close proximity to the residence of then United States Senator Howard Cannon. Senator Cannon, together with his neighbors, became interested in purchasing the Wonderworld property in order to prevent it from being used for commercial development.

During the transaction in question, legislation was pending in Congress which would lead to the deregulation of the trucking industry, a move strongly opposed by the Teamsters. As Chairman of the Senate Committee on Commerce, Senator Cannon was in a position to influence the future of the legislation. Since Senator Cannon and the Pension Fund each possessed something of value to the other party, the defendants participated in communications with the Senator for the objective of selling the Wonderworld property to him for $1,400,000 to the exclusion of higher bids, with the hope of influencing his position toward the deregulation legislation.

Defendants' ability to control the sale of the Wonderworld property was diluted by the necessity of delegating control over the assets of the Pension Fund to a management company, Victor Palmieri and Company, in order for the Pension Fund to retain its tax-exempt status. As a result, in order to consummate the sale of the Wonderworld property to the Senator as promised, the defendants were forced to pursue a less direct method of influence by encouraging the withdrawal of other potentially higher bids for the property. At the behest of defendant Lombardo, Thomas O'Malley and Andrew Massa, Pension Fund trustees, persuaded Allen Glick to withdraw his $1,600,000 bid for the Wonderworld property. Glick in turn persuaded his business partner, Fred Glusman, to withdraw his independent bid of $1,600,000. In spite of the defendants' efforts, Wonderworld was eventually sold to a corporation unrelated to the defendants for $1,600,000.

## II

In order to convict the defendants of wire fraud, two elements must be proven: (1) a scheme to defraud; and (2) use of wire communications in furtherance of the scheme.[3] Prior to *McNally*, courts had interpreted the mail fraud statute (18 U.S.C. § 1341), which criminalizes schemes "to defraud" or schemes to obtain "money or property by means of false or fraudulent pretenses ...", in the disjunctive, enabling conviction for schemes to defraud which did not necessarily include the deprivation of property rights. See *McNally* 107 S.Ct. at 2880. Accordingly, defendants' convictions in *McNally* were based on instructions charging the jury that the defrauding of the citizens of their intangible rights to honest and impartial government was sufficient to constitute mail fraud without a finding that the victims of the fraud were deprived of anything of value.

*McNally* involved the funnelling of insurance policies by the two defendants to insurance companies controlled or nominally owned by the defendants. Based on this transaction, defendants were charged with defrauding the Commonwealth of Kentucky and its citizens of their right to have "the Commonwealth's business and its affairs conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud" and obtaining money and other things of value by fraudulent means. *McNally* 107 S.Ct. at 2878, n. 4.

In reversing defendants' convictions the Supreme Court relied on the legislative in-

---

3. Section 1343, the wire fraud statute, provides in relevant part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be trans-

mitted by means of wire ... for the purpose of executing such scheme or artifice, shall be fined ... or imprisoned ..."

This language tracks the earlier mail fraud statute, 18 U.S.C. § 1341, and therefore is to be given a like construction.

tent surrounding the codification of the statute and the plain meaning of the words "to defraud". Its opinion concluded that § 1341 criminalizes only those offenses involving the deprivation of property rights by a scheme or artifice to defraud. "As the Court long ago stated, however, the words 'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *McNally* 107 S.Ct. at 2881, quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968. The Court held that the value which is the subject of mail fraud encompasses money and property, but does not include the intangible expectation of the citizenry to an honest government, despite what intangible value such honesty may hold for the defrauded victims.

The Supreme Court further articulated the contours of the new "money or property" requirement in *Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275, which involved R. Foster Winans' appropriation of confidential securities information prior to its publication in his Wall Street Journal column "Heard on the Street". In affirming the mail fraud conviction, the Court distinguished *McNally* by finding that the Journal had been defrauded of more than its right to the defendant's honest and faithful service, "an interest too ethereal in itself to fall within the protection of the mail fraud statute". *Carpenter* 108 S.Ct. at 320. The Court characterized the Journal's interest in the information contained in the column as a protectable property right in spite of its intangible nature. *"McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Carpenter* 108 S.Ct. at 320. In so holding, the Court rejected the defendants' argument that the Journal must demonstrate a monetary loss as a prerequisite to the defendants' mail fraud convictions. "Petitioners cannot successfully contend ... that a scheme to defraud requires a monetary loss ...; it is sufficient that the Journal has been deprived of its right to exclu-

sive use of the information." *Carpenter* 108 S.Ct. at 321.

### III

■ Defendants contend they were wrongfully convicted under the intangible rights theory subsequently rejected by the Supreme Court in *McNally.* They claim that this requires vacating the wire fraud convictions and even the bribery and interstate travel convictions on the basis that the latter were inextricably intertwined with the wire fraud charges. In order to determine whether defendants' convictions should be vacated, it is necessary to determine whether the indictment, jury instructions and evidence produced at trial required the jury to find that the defendants schemed to deprive the Pension Fund or its pensioners of a protectable property right within the scope of *McNally. United States v. Wellman,* 830 F.2d 1453, 1462 (7th Cir.1987). In so doing the Court is mindful of the dangers of engaging in a revisionary history of the indictment, evidence and jury instructions formulated prior to the *McNally* decision. Although the indictment and jury instructions clearly contain language supporting the invalid intangible rights theory of mail fraud, the jury nonetheless was required by the indictment and instructions to find that the defendants schemed to defraud the Pension Fund of property rights protected by the wire fraud statute despite defendants' lack of success. Such a finding was clearly justified by the evidence.

Paragraph 2 of Count Three of the indictment charged in part that the defendants devised a scheme and artifice:

(a) To defraud the Teamsters Pension Fund and its pensioners of their right to the conscientious, loyal, faithful, disinterested, and unbiased services of Thomas F. O'Malley and Andrew G. Massa, in the performance of acts related to their official duties, functions, and employment; *and*

(b) To obtain money and property by means of fraudulent pretenses and repre-

sentations (J.App. 9).[4]  (Emphasis added.) This terminology was incorporated by reference in Counts Four through Eleven. Similarly, the jury instructions charged:

> The phrase 'scheme and artifice to defraud,' as used in the indictment or these instructions includes any plan or course of action intended to deceive others out of something to which they were lawfully entitled, *and* to obtain by false or fraudulent pretenses or representations money or property from persons so deceived (J.App. 44).  (Emphasis added.)

The instructions (which consumed more than one hour) contained considerable elaboration of the then valid intangible rights aspect of wire fraud charging the jury that a scheme or artifice to defraud may include a scheme designed to deprive the Pension Fund of the "loyal, faithful, disinterested and unbiased services of the defendant O'Malley" and information necessary to the management company of the Pension Fund, as well as interference with the fiduciary duty of the Pension Fund trustees. Defendants argue that the discussion of the intangible rights theory overwhelmed the above *conjunctive* instruction given by Judge Marshall which required the jury to find both a scheme to defraud the Pension Fund as well as the deprivation of the Pension Fund of money or property, such that it is impossible to decipher on which theory the jury convicted the defendants.[5]

Although the instructions given by Judge Marshall did thoroughly discuss the intangible rights theory, the discussion was merely an elaboration of what may constitute a "scheme to defraud". Once the jury determined whether the defendants were guilty of a scheme to defraud as defined by Judge Marshall to include the deprivation of tangible and intangible rights, the jury was still required by the indictment to find that the defendants participated in a scheme to "obtain money and property by means of fraudulent pretenses and representations" (J.App. 9).  And "[w]here a fraud scheme involves multiple objectives, some of which are insufficient to state an offense under *McNally*, the remaining charge or charges will be deemed sufficient to state the offense if they are 'easily separable' from the charges deemed insufficient." *United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir.1988).  The jury instructions did not allow conviction based on the intangible rights theory alone nor as an alternative to the money or property requirement.  In light of *McNally* and the law of this Circuit, the intangible rights portion of the jury instructions was not prejudicial when viewed in the context of the conjunctive indictment and Judge Marshall's conjunctive definition of wire fraud. Therefore, *United States v. Price*, 857 F.2d 234, 236 (4th Cir.1988), on which the defendants rely, is inapplicable.

The evidence presented at trial further supports the conclusion that the defendants engaged in a scheme to obtain money or property by fraudulent means.  The essence of the conduct in which defendants engaged was the attempted sale of the Wonderworld property to Senator Cannon and his neighbors for $1,400,000 in spite of the existence of higher bids for the property.  Such a scheme clearly contemplated depriving the Pension Fund of the highest price for the Wonderworld property.  Defendants attempt to justify their behavior by arguing that their conduct was motivated by their desire to benefit the Teamsters Union by blocking the deregulation legislation in return for the relatively small sacrifice of a reduction in price secured by the sale of the Wonderworld property to Senator Cannon.  Defendants feebly reason that their conduct is indistinguishable from the scheme contained in *McNally* because defendants did not seek to obtain something of value for themselves but for the benefit of the Teamsters.

Defendants' rationalizations miss the mark.  *McNally* did not posit the further requirement that the scheme to obtain money or property by fraudulent means result in a benefit to the schemers.

---

**4.**  The property aspects of the wire fraud were also emphasized in paragraphs 3 and 4 of Count Three (J.App. 9–10).

**5.**  Additional portions of the charge stressing the property aspects of the charge are reproduced in Judge Marshall's memorandum opinion (Lombardo App. 3–4).

*McNally* simply requires the devising of a scheme for the purpose of obtaining property rights by false means. Admittedly, most schemes to defraud are designed to benefit the schemers personally. This does not transform the characteristic of personal pecuniary benefit into an element of the crime nor make defendants' conduct less culpable. The mail fraud statute is primarily concerned with the protection of the rights of victims. "[T]he original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *McNally* 107 S.Ct. at 2880. The Pension Fund was no less harmed as a result of defendants' wire fraud scheme to sell the Wonderworld property to Senator Cannon for a bargain price than if the defendants had purchased the property themselves and received the benefit of the $200,000 reduction in the price. The fact that defendants were depriving the Pension Fund of property for the purposes of securing a benefit of equal or greater value (*i.e.*, the "appreciation" of Senator Cannon), does not deflect from the reality that the pensioners were being deprived of property without their knowledge by fraudulent means.

The district court's order denying defendants' motion to vacate pursuant to 28 U.S.C. § 2255 is affirmed.