**Reza TOULABI, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

**No. 88–2573.**

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1989.

Decided May 15, 1989.

Mark J. Thomas, Chicago, Ill., for petitioner-appellant.

Sheila Finnegan, Asst. U.S. Atty., Chicago, Ill., for respondent-appellee.

Before POSNER, EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

To be a taxi driver in London, a person must master The Knowledge (468 difficult

---

routes through London's labyrinth), a process that usually takes two years, and so demonstrate ability to go smoothly from one place in the city to any other. Financial Times of London, March 22, 1989, page 16. To be a taxi driver in Moscow, a person must acquire the CIA's map of the city, for until recently the USSR's own street maps were intentionally inaccurate, omitting such landmarks as the headquarters of the KGB. New York Times, Sept. 3, 1988 (reporting the Soviet Union's release of accurate maps for the first time since the late 1930s). To be a taxi driver in Chicago, a person must pay a fee of $50 and answer correctly 20 out of 25 questions on a test of local geography. An aspirant alternatively could pay between $350 and $600 to Reza Toulabi, whose henchmen in the Division of Public Vehicle Operations would furnish the would-be cabbie with the answers to the quiz. Perhaps more important to Toulabi's customers, his confederates would arrange for the license to issue without the City's inquiring of the Immigration and Naturalization Service whether an alien applicant was authorized to work in the United States.

In 1985 a jury convicted Toulabi of mail fraud. The mail was used to send the licenses to the clients, cf. *Schmuck v. United States*, — U.S. —, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); the fraud was the deceit practiced on the City of Chicago, which was led to issue licenses to persons not entitled to receive them. At the time of the indictment and conviction, this circuit adhered to the "intangible rights doctrine", under which a scheme to deprive a governmental body of the honest services of its employees satisfied the fraud element of the statute. The indictment laid out an "intangible rights" scheme, charging that Toulabi and retainers defrauded "the citizens of the City of Chicago of their right to the loyal, faithful and honest services of [the two employees] in the performance of acts related to their public employment", and of "their right to have the business of the [agency] conducted honestly, fairly, impartially, free from corruption, collusion, partiality, dishonesty, bribery and fraud, and in accordance with the laws of the City

of Chicago". Why the United States should be so interested in enforcing "the laws of the City of Chicago" is something of a mystery. The mailings here were not the mechanism of deceit. State and local governments commonly prosecute violations of their own laws, and Toulabi was not so well-connected that he lived without anything to fear from local authorities. Congress has never considered the proper role of federal law in prosecuting garden-variety governmental corruption, apart from the extortion covered by the Hobbs Act—hence the need to create theories such as the intangible right to honest services, when any statute designed for local corruption could be written less elliptically. So long as the intangible rights approach prevailed, however, the decision to pursue cases of this sort lay within the discretion of the federal prosecutor.

*McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), rejected the intangible rights doctrine, holding that a scheme violates 18 U.S.C. § 1341 only if it deprives the victim of "property". Ever since, federal prosecutors have been waging a rear-guard action to preserve convictions secured under prior law. When the jury must have found a deprivation of property, we affirm on direct appeal even though the indictment was cast in terms of intangible rights. E.g., *United States v. Wellman*, 830 F.2d 1453 (7th Cir.1987). The court examines the evidence and instructions to piece together the conclusions that the jury necessarily reached. If the jury could have founded its verdict on the intangible rights doctrine, we set the judgment aside even though the indictment might have supported a verdict on a proper charge.

When the case arrives on collateral attack, as this one does (Toulabi was on probation by the time he filed his petition under 28 U.S.C. § 2255), things are not so simple. Collateral relief is available only when the custody violates the Constitution or laws of the United States. A change of law showing that the indictment does not state an offense may supply the foundation for relief, *Davis v. United States*, 417 U.S.

333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). And *Magnuson v. United States*, 861 F.2d 166, 167 (7th Cir.1988), holds that *McNally* is the sort of fundamental change that must be applied under § 2255. How should *McNally* properly be taken into account?

Surely not by giving the defendant what amounts to a second appeal of his conviction. *Davis* tells us that a change of law showing that the defendant has been punished "for an act that the law does not make criminal", 417 U.S. at 346, 94 S.Ct. at 2305, entitled the prisoner to relief. So a court must inquire whether the indictment states an offense. Should it do more? Section 2255 authorizes all inquiries usually made on collateral attack, and a prisoner may ask the court to determine whether there was sufficient evidence to allow a reasonable trier of fact to conclude, beyond a reasonable doubt, that the defendant committed a crime. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Section 2255 also allows courts to redress a defect that "so infected the entire trial that the resulting conviction violates due process", *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). This language has been used since *Davis* to support collateral review if the instructions omit an essential element of the offense and therefore undermine the fairness of the trial. *Henderson v. Kibbe*, 431 U.S. 145, 155–57, 97 S.Ct. 1730, 1737–38, 52 L.Ed.2d 203 (1977) (holding that the omission from the instructions of an element of the offense did not require a new trial, although it would have called for reversal on direct appeal). The extent of this review remains a contentious issue. Compare *Cole v. Young*, 817 F.2d 412, 423–27 (7th Cir.1987), with *id.* at 435–40 (dissenting opinion); cf. *Pope v. Illinois*, 481 U.S. 497, 502–03, 107 S.Ct. 1918, 1921–22, 95 L.Ed.2d 439 (1987).

Which of these inquiries a court conducts on collateral attack is the defendant's choice. The prisoner could contend that the indictment fails to state an offense while conceding (by silence) that the evidence would have been sufficient under *Jackson* had the charge been adequate.

The prisoner might focus on the jury instructions, contending that they omitted an element essential (in retrospect), and that the shortfall was so serious that it violated the Due Process Clause as *Cupp* and *Henderson* have applied it to missing-instruction cases. No matter the tack used, the parties and court must have in mind the difference between direct and collateral review. See *Johnson v. United States*, 805 F.2d 1284, 1288 (7th Cir.1986); *Johnson v. United States*, 838 F.2d 201 (7th Cir.1988). Sometimes our court has approached *McNally* cases in this spirit. See *United States v. Doe*, 867 F.2d 986, 989–90 (7th Cir.1989); cf. *United States v. Keane*, 852 F.2d 199 (7th Cir.1988) (when § 2255 is unavailable because the sentence ended before the filing of the challenge, the scope of review is more confined). On other occasions, however, the court has not even mentioned the difference between direct and collateral review, examining the record and jury instructions as if the case were on direct appeal. E.g., *Messinger v. United States*, 872 F.2d 217 (7th Cir.1989); *Lombardo v. United States*, 865 F.2d 155 (7th Cir.1989). Our case shows why this might occur. Toulabi contended exclusively that the indictment failed to state an offense. He was content to surrender any arguments based on the evidence and the jury instructions. The United States Attorney replied, however, that the court must scrutinize the evidence and the instructions, and it chastised Toulabi for failing to supply these tools of decision. The prosecutor then briefed the issues just as if this were a direct appeal, and Toulabi responded in kind. This is a common sequence in *McNally* cases on collateral attack, and it is then not surprising when the court—without mentioning the difference between direct and collateral attack—proceeds to conduct a second full review. The prosecutor's curious choice precludes us from deciding in today's case how far an appellate court should inquire into the record and instructions of a case on collateral review after *McNally*. We accept the case as the parties have presented it, examining the

record and instructions as we would on direct appeal.

Toulabi's indictment, although brimming with the buzz-words of the intangible rights doctrine, may well state an offense under § 1341 given *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Just as a newspaper may have a property interest in information about the stock market, see *Carpenter*, so the City of Chicago may have a property interest in its test for hacks. See *United States v. Thomas*, 686 F.Supp. 1078 (M.D.Pa.1988). Confidentiality may be important to the integrity of the licensure program, just as holding the contents of its columns confidential until publication may be important to the integrity of the Wall Street Journal's reportage, which affects its profitability. Unlike the Journal, which sells papers, the City does not sell tests. Nonetheless, it had an investment in the test. Once the information got out the City may have had to design a new test, at some expense. Maps of Chicago are more readily available (and more accurate) than those of Moscow, and Chicago does not have a property interest in the fact that Cornell Avenue is east of Drexel Street, but the particular questions it chooses to ask are distinct from the plat of the City. Cf. *Rockford Map Publishers, Inc. v. Directory Service Co.*, 768 F.2d 145 (7th Cir. 1985). Tests are not free goods; many services keep their tests secure and charge stiff fees for writing one (the Educational Testing Service, the designer of the College Board exams, is a good example).

We need not decide whether an indictment limited to the contention that Toulabi defrauded Chicago out of the value of its geography test would state an offense, or whether this indictment would have supported his conviction had the instructions informed the jury that depriving Chicago of the value of the test was an essential ingredient of the crime. The instructions actually said the opposite, telling the jury that "it is not necessary that the government prove all of the false pretenses, representations, promises, and acts charged". These other "pretenses, representations, promises, and acts" included depriving Chicago of the honest services of its employees in a way indistinguishable from the scheme involved in *McNally*. Accepting bribes to issue licenses did not deprive Chicago of property; it fattened the City's treasury by $50 (the license fee) for each extra license issued.

Belatedly the government has discovered two "property" interests in this scheme: in the licenses themselves, and in the right to control the activities of the employees of the Division of Public Vehicle Operations. Neither shows that Toulabi's jury must have found that his scheme deprived Chicago of property.

The license may be property from the driver's perspective, in the sense that he may not be compelled to surrender the entitlement except on proof of wrongdoing. For constitutional purposes an entitlement depending on substantive criteria is "property". E.g., *Barry v. Barchi*, 443 U.S. 55, 64 n. 11, 99 S.Ct. 2642, 2649 n. 11, 61 L.Ed.2d 365 (1979) (license to train horses); *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (Illinois driver's license). From the government's perspective, however, the license is a promise not to interfere rather than a sliver of property. Chicago does not put a cap on the number of chauffeurs' licenses it will issue (quite unlike the limit on the number of taxi medallions). All the license signifies from the City's perspective is that the driver met the substantive criteria for the profession—which in Chicago means a rudimentary knowledge of the street layout and the ability to communicate in English, nothing more. The check with the INS to determine whether an alien applicant is entitled to work vindicates national rather than local policy, and this, too, is a regulatory rather than property interest. Taxi driving is not something made possible by dint of the City's resources; it is something the applicant can do without the City's assistance, and the license simply signifies that the City will not hinder or penalize one who pursues this line of work. Cf. *Scott v. Village of Kewaskum*, 786 F.2d 338, 340 (7th Cir.1986).

As for the government's interest in ensuring that employees' activities conform

with the substantive rules of law: that's the intangible rights doctrine by another name. See *Ward v. United States,* 845 F.2d 1459 (7th Cir.1988); *United States v. Holzer,* 840 F.2d 1343 (7th Cir.1988). All the "intangible right" ever amounted to was the interest of the government in having employees earnestly carry out the law, rather than pursue an antagonistic private agenda. *Holzer,* 840 F.2d at 1348, rejects the contention that *McNally* is limited to cases in which no state law required the bribed servants to act other than as they did. Judge Holzer, who accepted money in exchange for his decisions, frustrated the power of the government to carry out legal norms every bit as much as Toulabi and cohorts undercut Chicago's ability to decide who shall receive a chauffeur's license, yet we held that § 1341 did not make a federal crime out of exchanging judicial acts for money. So too with *Ward,* observing that unless the altered decision cost the government money (as by depriving it of a fine an honest judge would have imposed), the scheme had not deprived the government of property.

Like the defendants in *McNally,* Toulabi undermined the public's interest in the fair and impartial administration of its laws. But if we put to one side the theft of answers to the geography test (and the City's consequent need for a replacement), Toulabi deprived Chicago of no *more* than its interest in honest administration of the law—of no more than what *McNally* held is insufficient to make out a violation of § 1341. Only the test is a plausible species of "property" from the City's perspective, and as the jury did not necessarily find that Toulabi's scheme deprived Chicago of this property, the judgment denying his petition for relief under § 2255 is

REVERSED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court and am also pleased to join the basic reasoning of the well-written majority opinion. I write separately only because I cannot see the need for, nor do I agree with, the suggestion that the government should have limited its presentation in this court to an examination of the indictment. *Ante* at 124–125.

The government was justified in examining the instructions and the evidence at trial for two reasons. First, the appellant specifically argued that the instructions of the trial court permitted a verdict of guilty to be premised on the "intangible rights" theory condemned by the Supreme Court in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Appellant's Br. at 11–12. Secondly, the government correctly read our earlier post-*McNally* cases under section 2255 as doing more than focusing on the sufficiency of the indictment. For instance, in *Messinger v. United States,* 872 F.2d 217, 221 (7th Cir.1989), the court explained that "we must ... examine the indictment, the evidence, and the jury instructions to see if the jury necessarily had to convict Messinger for defrauding Cook County of its property right ... notwithstanding any intangible rights theory employed." Similarly, in *Lombardo v. United States,* 865 F.2d 155 (7th Cir.1989), *petition for cert. filed,* April 3, 1989, the court stated that, "[i]n order to determine whether defendants' convictions should be vacated, it is necessary to determine whether the indictment, jury instructions and evidence produced at trial required the jury to find that the defendants schemed to deprive the [victim] of a protectible property right within the scope of *McNally.*" 865 F.2d at 158 (citing *United States v. Wellman,* 830 F.2d 1453, 1462 (7th Cir.1987)). Because the "jury instructions did not allow conviction based on the intangible rights theory alone nor as an alternative to the money or property requirement," *id.* at 159, the court denied petitioners' motion to vacate their convictions under section 2255. The same analysis was used by the court in *Moore v. United States,* 865 F.2d 149 (7th Cir.1989). In considering a petition for post-conviction relief under section 2255, the court stated that it was required to consider "the evidence, the indictment and the instructions." 865 F.2d at 151. Because the jury could not have found a scheme to defraud the victim of intangible rights separate from a

criminal scheme to obtain money or property, the court concluded that the jury's verdict did not rest exclusively on the insufficient intangible rights ground. *Id.* at 154. Thus, the indictment, evidence, and instructions taken together did not require the court to "upset a conviction which was clearly based on loss of money or property." *Id.; see also United States v. Folak,* 865 F.2d 110, 113 (7th Cir.1988) (section 2255 case in which court considered the indictment and the evidence introduced and concluded that " 'the government could not logically prove one scheme without proving the other since the elements of the two were identical' ") (quoting *Wellman,* 830 F.2d at 1463); *Magnuson v. United States,* 861 F.2d 166, 168 (7th Cir.1988) (section 2255 case in which court examined the indictment, the instructions, and the evidence in determining that the conviction ought to be vacated as resting on an intangible rights theory); *cf. Ward v. United States,* 845 F.2d 1459, 1463 (7th Cir.1988) ("The root difficulty of the government's case is not that the case went to the jury on a completely different theory from the one argued in this court but that the theory now pressed has no support in the record.").

With the exception of *United States v. Keane,* 852 F.2d 199 (7th Cir.1988), *petition for cert. filed,* January 14, 1989, our *coram nobis* cases follow the analysis employed in section 2255 cases. Indeed, *United States v. Doe,* 867 F.2d 986 (7th Cir. 1989), does more than inquire *only* whether the indictment states an offense. After concluding that the indictment in *Doe* did charge an offense, the court went on to address the petitioner's claim that he was entitled to relief because of erroneous jury instructions. Although the instructions were erroneous and may have required reversal on direct appeal, this case was before the court on writ of error *coram nobis.* Thus, the court stated that it "must ask whether these instructions would have warranted relief under 28 U.S.C. § 2255." 867 F.2d at 989. Such relief is warranted when " 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " 867

F.2d at 990 (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977)). The court then reviewed the jury instructions and the evidence and concluded that "the jury could not have convicted Gorny unless it found he reduced tax assessments in return for bribes." *Id.* Because the jury could not have convicted the petitioner merely because he defrauded Cook County of good government, the court concluded that the conviction (based on erroneous jury instructions) did not violate due process. For this reason, the defective instructions could not support a petition for a writ of error *coram nobis.* While the court did deny petitioner's collateral attack in *Doe,* it clearly did more than merely inquire into whether the indictment charged an offense. *See also United States v. Bonansinga,* 855 F.2d 476, 479–80 (7th Cir.1988) (post-*Keane coram nobis* case in which court, after concluding that indictment did charge an offense, rejected argument based on erroneous jury instructions: "[w]hat is crucial is that the 'scheme to defraud' was not defined in such a way as to allow conviction for conduct which was not an offense") (quoting *Wellman,* 830 F.2d at 1463) (court upheld conviction because it was satisfied that petitioner was convicted of conduct which, consistent with *McNally,* was in derogation of the mail fraud statute).

Nor do our cases suggest that, in order to obtain more than a review of the face of the indictment, the section 2255 petitioner must specifically plead a defect in the instructions or in the evidence. *Cf. Bonansinga,* 855 F.2d at 477, 479 (petitioner challenged indictment and jury instructions; court refused to vacate conviction in part because it accepted the government's argument that "the only *evidence* introduced in support of Bonansinga's intangible rights prosecution" unequivocally demonstrated Bonansinga's participation in conduct clearly prohibited by the mail fraud statute as construed in *McNally* ) (emphasis supplied). Moreover, while not all of these cases have found it necessary to emphasize the point, they have all recognized, as a fundamental element of their methodology, that the

court's task in a section 2255 proceeding is to ensure that the appellant was convicted because he engaged in conduct proscribed by the mail fraud statute. The instructions and the evidence were examined to answer this basic question, not to identify any procedural flaw that, on direct appeal, might have required a new trial. This approach is certainly compatible with the Supreme Court's holding in *Davis v. United States,* 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). That case hardly suggests that a section 2255 inquiry must be limited to the indictment. It simply emphasizes that, on collateral attack, the appropriate inquiry is limited to "whether the claimed error of law was 'a fundamental defect which inherently results in a complete miscarriage of justice,' and whether '[i]t ... present[s] exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent.'" *Id.* at 346, 94 S.Ct. at 2305 (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)).

In its brief, the government argued that the indictment sufficiently charged an offense and that the jury instructions did not render the trial fundamentally unfair since it was impossible for the jury to find the existence of a scheme to deprive the City of intangible rights without also finding the existence of a scheme to deprive the City of property interests. *See* Appellee's Br. at 19–24. This is substantially the same analysis that this court's cases have employed in reviewing section 2255 attacks on pre-*McNally* mail fraud convictions. It is the analysis we should expect to see from the government in future cases as well.