**UNITED STATES of America, Plaintiff,**

v.

**Norby WALTERS, Defendant.**

**No. 88 CR 709.**

United States District Court,
N.D. Illinois, E.D.

Oct. 11, 1991.

Robert Gold, New York City, Tyrone C. Fahner, Mayer, Brown & Platt, Chicago, Ill., for defendant.

Howard Pearl, U.S. Atty., Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Defendant, Norby Walters ("Walters"), was charged in a seven-count indictment with Racketeering, Racketeering Conspiracy, Mail Fraud, and Conspiracy. On April 13, 1989, in a trial before Judge Marovich of this court, a jury convicted Walters and co-defendant, Lloyd Bloom ("Bloom"), on six counts, including two counts of mail fraud. On September 17, 1990, the Seventh Circuit Court of Appeals reversed all the convictions and remanded the case for a new trial on the ground that it had been an error to refuse to instruct the jury on the advice defendants received from counsel. 913 F.2d 388. Bloom subsequently requested assignment to Judge Marovich pursuant to General Rule 44(a). The case was therefore bifurcated for trial, and Walters is before this court on remand.

Defendant now moves to dismiss the indictment, arguing that the evidence presented by the government during his first trial ("Walters I") is insufficient to support a guilty verdict on the mail fraud

counts.[1] Defendant's motion raises several questions concerning the scope of the federal mail fraud statute, 18 U.S.C. § 1341. After careful examination, the court denies defendant's motion to dismiss the indictment.

### Facts and Procedural History.

According to the indictment, Walters and Bloom, operating as World Sports and Entertainment, Inc. ("WSE"), approached a number of college football players and persuaded them to sign representation agreements ("agreements"). Walters and Bloom presented themselves as experienced agents who could assist the athletes in post-collegiate contract negotiations with National Football League franchise organizations. According to the indictment, Walters and Bloom offered each player a "signing bonus," which was increased if an athlete appeared reluctant to sign. Inducements offered by Walters and Bloom included: "large amounts of cash; monthly wire transfers of funds; interest-free loans; automobiles; clothing; concert and airline tickets; trips to New York City; hotel accommodations; use of limousines; trips to major entertainment events; introduction to prominent entertainers; cash payments and other benefits for family members; and insurance policies." Superseding Indictment Count I, ¶ 14.

A major source of some players' reluctance was the fact that the National Collegiate Athletic Association ("NCAA"), the Mid–American Athletic Conference and the InterCollegiate Big Ten Conference ("Big Ten") (collectively referred to as the "Associations") had regulations which strictly governed the amateur status of athletes who played for member colleges. Essentially, these regulations provided that a student-athlete was ineligible to participate in intercollegiate athletics if that athlete:

(1) contracted with an agent to be represented in the marketing of the athlete's athletic ability or reputation;

(2) agreed to receive financial compensation for participation in intercollegiate athletics when the compensation was to be received following the completion of the athlete's intercollegiate career; or

(3) received financial assistance from a source other than the school-administered program, excluding support received from the athlete's family or aid awarded without regard to the athlete's athletic ability.

NCAA rules and regulations provided for a limit on the number of athletic scholarships which a school could offer each year in any particular sport. In Division I–A football, each school was permitted to award up to 30 athletic scholarships per year. The rules further provided that a college could have no more than 95 scholarships in effect each year in any particular sport.

In order to implement these regulations, the Associations required the athletes to submit eligibility statements ("statements") to the colleges certifying that they had complied with the regulations. The statements were then forwarded to the Associations. The regulations provided that any athlete who knowingly submitted false or misleading information to his college regarding his compliance with the regulations was ineligible to compete in intercollegiate athletics or to receive an athletic scholarship.

In order to persuade the players to sign, Walters and Bloom allegedly devised a scheme to prevent the disclosure of the agreements. First, Bloom and Walters told each player that WSE's copy of the agreement would be kept hidden in an office safe. Second, in the event that the agreement was discovered, it was post-dated until after the player's eligibility had expired.

The indictment alleges that on a number of occasions defendants' practice of signing players to the agreements resulted in the submission of false information to both the

---

**1.** The indictment also alleges that Bloom and Walters committed extortion and fraud in their capacity as booking agents for various musical groups, including the "Jackson Five." These activities formed the basis for the substantive RICO and RICO conspiracy counts in the indictment. These counts are not challenged by defendant at this time.

colleges and the Associations. After signing representation agreements, a number of players provided statements to their colleges certifying that they were eligible to play intercollegiate football. These representations were false, since the players' eligibility terminated upon the execution of the agreements. The indictment further alleges that the submission of false information deprived the schools of both scholarship funds and the right to allocate a limited number of scholarships among eligible athletes.

## DISCUSSION

Where a defendant moves to dismiss an indictment, the court is "not concerned with the truth or falsity of any factual allegation ... [i]nstead the issue is whether the facts as alleged constitute violations of the relevant statute." *U.S. v. Lytle*, 677 F.Supp. 1370, 1374 n. 8 (N.D.Ill.1988); *See also U.S. v. Sampson*, 371 U.S. 75, 78–79, 83 S.Ct. 173, 174–75, 9 L.Ed.2d 136 (1962).

Defendant Walters moves the court to dismiss the indictment on three grounds: first, the government has failed to allege a violation of the mail fraud statute; second, the evidence is insufficient to prove that defendant knew about the false representations made by the athletes to the colleges; and third, the mails were not used "in furtherance of" the alleged scheme.[2]

Scope of the Federal Mail Fraud Statute

Defendant challenges the indictment on the ground that it does not charge him with an offense under the mail fraud statute. The federal mail fraud statute provides in relevant part that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme or artifice ... places in any post office ... any matter or thing whatever ... shall be fined not more than $1000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341. Defendant maintains that the indictment does not

properly allege that the scheme was "devised ... for obtaining money or property." 18 U.S.C. § 1341.

Defendant advances two analytically distinct arguments. First, defendant contends that the mail fraud statute, as interpreted by the United States Supreme Court in *McNally v. U.S.*, 483 U.S. 350, 356, 107 S.Ct. 2875, 2879, 97 L.Ed.2d 292 (1987), only applies where the "affirmative goal" of a scheme is to obtain money or property through fraud. According to defendant, the scheme alleged was not affirmatively designed to deprive the colleges of scholarship funds. Defendant maintains that, at most, his conduct only incidentally effected such a deprivation.

Second, defendant argues that the colleges did not suffer a deprivation of property or money as a result of his activity, because the scholarship money would have been paid to the players even in the absence of the alleged scheme.

Contrary to defendant's earnest assertions, the Supreme Court's decision in *McNally* does not fully resolve these two questions. It does, however, provide some guidance in evaluating the merits of defendant's arguments. The court will, therefore, briefly examine the *McNally* decision.

### *McNally*

*McNally* involved a mail fraud prosecution of two Commonwealth of Kentucky officials. The relevant portion of the indictment charged the defendants with a scheme "to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly...." *McNally*, 483 U.S. at 353, 107 S.Ct. at 2878. At trial, the jury was not told that in order to convict they had to find that the Commonwealth of Kentucky had actually been defrauded of money or property. Both defendants were convicted on the mail fraud counts. On appeal, the petitioners argued that the mail fraud convictions were invalid because the

---

**2.** These arguments were also raised by Walters on appeal. The Seventh Circuit, however, declined to pass upon them. Contrary to the government's urging, this court draws no inference from the appellate court's non-treatment of the issues.

jury did not find that the scheme was devised to obtain money or property.

The United States Supreme Court agreed. Although the statute was drafted in the disjunctive, the court held that its legislative history and traditional application required that it be read in the conjunctive. In order for an indictment to stand under 18 U.S.C. § 1341, the offense charged must involve a scheme that was devised to defraud *and* to obtain money or property by false or fraudulent pretenses. As the court stated, "[r]ather than construe the statute in a manner that leaves its outer boundaries ambiguous ... we read § 1341 as limited in scope to the protection of property rights." *McNally*, 483 U.S. at 360, 107 S.Ct. at 2882.

A) Meaning of "for obtaining money or property"

■ Following the Supreme Court's decision in *McNally*, a number of courts had the opportunity to address the applicability of the mail fraud statute in cases where the offense charged involved a non-economic deprivation. Many of these cases were post-*McNally* challenges to indictments or convictions which had been handed-up or entered before the *McNally* decision was issued. Invariably, the underlying scheme involved the bribery of a governmental official or the use of political clout to influence a certain governmental decision. The courts rejected the use of the mail fraud statute in these so-called "intangible rights" prosecutions, explaining that the statute only reached schemes "that had as their goal the transfer of something of economic value to the defendant." *U.S. v. Baldinger*, 838 F.2d 176 (6th Cir.1988). *See also U.S. v. Goodrich*, 871 F.2d 1011 (11th Cir.1989); *U.S. v. Mandel*, 862 F.2d 1067, 1072 (4th Cir.1988), *cert. denied*, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989).

■ The operative language in *Baldinger* is "economic value." To come within the scope of Section 1341, the scheme must have been devised to obtain "money or property." However, by quoting language out of context, defendant manipulates the plain meaning of a number of post-*McNally* decisions. Defendant argues that Section 1341 only punishes a scheme that has "as its goal" the deprivation of money or property. Defendant maintains that since his "goal" was not to deprive the colleges of scholarship money, his activity does not come within the punitive ambit of the mail fraud statute.

Defendant relies on a number of cases, in addition to the ones cited *supra*, to support his claim that a scheme must have "as its goal" the deprivation of money or property. In *Ward v. U.S.*, 845 F.2d 1459 (7th Cir. 1988), the defendant was an attorney charged with bribing a state court judge in order to secure a suspended sentence for a client. The client's case was put on the court's regular calendar. When the client's case was called, the judge sentenced him to 364 days in jail. Later, reminded of the bribe, the judge ordered the defendant released from custody. As part of the original arrangement, the attorney reimbursed himself with the proceeds from the bail bond refund. He was eventually charged and convicted of mail fraud. On appeal, the government defended the conviction by arguing that the bribery scheme adversely affected the government's security interest in the bail bond.

The court of appeals rejected that argument. It did so because no "property" was taken, not because the scheme was not affirmatively designed to deprive the state of its property. Under Illinois law, the bail bond is refunded upon the disposition of the case, whether or not the defendant is convicted of the offense charged. In this instance, the refund occurred when the defendant was sentenced to 364 days. The court noted that had the refund been accelerated because of the bribe (thereby depriving the state of its security interest in the bond money), a mail fraud prosecution would have been proper.

*Messinger v. U.S.*, 872 F.2d 217 (7th Cir. 1989), involved a scheme almost identical to the one in *Ward*, with one crucial difference: in *Messinger*, the bribe was contingent upon the issuance of a pre-trial ruling favorable to the defendant. That ruling

prematurely terminated the prosecution and accelerated the refund of the bail bond. Relying in part upon the dicta in *Ward*, the court held that the acceleration of the refund deprived the state of a property right in the bond.

The case of *U.S. v. Holzer*, 840 F.2d 1343 (7th Cir.1988) involved the bribery prosecution of an Illinois state trial judge. The judge had allegedly solicited bribes in the form of "loans" from attorneys with cases before him and from persons seeking appointments by the court as receivers. The government argued that by taking bribes Holzer became the constructive trustee of the bribe money. By failing then to turn the money over to the state, he deprived the state of its right to the property in violation of Section 1341.

In rejecting the government's argument, the court explained that "taking one's employer's property by fraud ... and failing to convey the receipts of bribery to one's employer are not the same acts. The bribe became the employer's property through the fiction of a constructive trust not because he bargained for them but to make sure that the dishonest employee does not profit from them." *Holzer*, 840 F.2d at 1347.

The crux of the holding in *Holzer* distinguished "deprivation" in the bribery context from traditional mail fraud, where the defendant deprives a party of that party's own money or property. Here, the indictment charges defendant with the latter offense. Defendant's reliance upon constructive-trust principles to buttress his argument is therefore misplaced. If anything is to be garnered from *Holzer*, it is that an individual who defrauds an employee's (here athlete's) employer (here college) of the employer's own money, may be prosecuted under the mail fraud statute.

Defendant cites only one case that comes close to supporting his position. In *U.S. v. Regan*, 713 F.Supp. 629 (S.D.N.Y.1989), the defendants were bond traders and employees of one of two investment firms. One of the firms, Drexel Burnham Lambert, Inc. ("Drexel"), entered into a recapitalization agreement with Mattel, Inc. ("Mat-

tel"). As part of that agreement, Drexel agreed to limit its right to acquire Mattel securities. This provision was important to Mattel because it reduced the chance that Mattel would lose its net operating loss for tax purposes.

However, unbeknownst to Mattel, Drexel had "parked" Mattel stock with the second investment firm. The stock was parked so that Drexel could maintain effective ownership of the Mattel stock in spite of the recapitalization agreement. Had Mattel known about this scheme, it would have been unwilling to pay as much as it did for Drexel's services.

The defendants were charged with "scheming to hide Drexel's breach of its agreement with Mattel so as to reap the benefits therefrom" in violation of the mail fraud statute. *Regan*, 713 F.Supp. at 636. In defending the indictment against a motion to dismiss, the government argued that "a necessary consequence of defendants' actions was to deprive Mattel of the full value of the services it purchased...." *Id.*

The district court rejected that argument and dismissed the counts of the indictment relating to the Mattel transaction. According to the court, "[i]t is not enough that the scheme be designed to deprive its victims of an intangible right for which money or property has been paid. The money or property must be a goal of the plot, not just an inadvertent consequence of it." *Id.* at 637.

While the above language from *Regan* seems to provide support for defendant's position, a close examination reveals that the case actually provides little guidance in addressing the specific issue raised by defendant. In *Regan*, the non-purchase provision was part of the original recapitalization agreement. There was no evidence that the defendants intended to breach that provision at the time the recapitalization agreement was executed. They were simply charged by the government with scheming to conceal the breach after the fact.

In the present case, the misrepresentations were made to the colleges *after* the

players were ineligible to participate in intercollegiate athletics. The colleges were thus induced to continue financial support through fraud. These affirmative misrepresentations are analogous to an initial fraudulent inducement to contract, since the continuation of scholarship payments was dependent upon continued eligibility. According to the court in *Regan,* such an inducement constitutes "garden variety mail fraud." *Regan,* 713 F.Supp. at 637.

Furthermore, the court in *Regan* explained that the indictment was deficient because it charged the defendants with depriving Mattel of an "intangible right." As the court stated, "a right to honest and faithful performance of contractual obligations is not property for purposes of the mail and wire fraud statutes." *Regan,* 713 F.Supp. at 636. In contrast, the scholarships were not intangible and were not awarded as consideration for continued player eligibility. Rather, the continued receipt of scholarship funds was contingent on continued eligibility. Walters' offense was that he executed agreements which, by their very existence, made the players ineligible to receive scholarship money. At the same time, he allegedly knew 1) that misrepresentations would subsequently be made to insure that the players continued to receive the aid, and 2) that those misrepresentations were necessary to the success of his scheme.

■ Defendant has failed to support his position that a scheme must have as its "affirmative objective" the deprivation of money or property in order to make out an offense under the mail fraud statute. A more sensible interpretation of the statute would indicate that a scheme is devised "for obtaining" money or property when the defendant knows that its success requires a specific fraudulent deprivation of money or property. That deprivation need not be the "affirmative goal" or the "ultimate objective" of the schemers. Indeed, the deprivation of money or property need not directly benefit the schemers, so long as it advances the scheme. *See Lombardo v. U.S.,* 865 F.2d 155, 159–160 (7th Cir.

1989), *cert. denied,* 491 U.S. 905, 109 S.Ct. 3186, 105 L.Ed.2d 695 (1989); *See also U.S. v. Diwan,* 864 F.2d 715, 719–20 (11th Cir. 1989), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989).

■ Defendant is correct in one respect: an indictment does not charge an offense under the mail fraud statute simply because the scheme "results" in a deprivation of money or property. In order to convict, a jury must believe that the defendant operated with the intent to obtain money or property by fraud. *U.S. v. Reicin,* 497 F.2d 563, 571 (7th Cir.1974), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *U.S. v. Feldman,* 711 F.2d 758, 763 (7th Cir.1983), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983).

B) Relevance of pre-scheme eligibility

■ Defendant also maintains that this prosecution is precluded by the fact that the scholarship money would have been paid to the players in the absence of defendant's scheme. Neither existing case law nor the language of the mail fraud statute support defendant's interpretation. The statute punishes a scheme devised to obtain money or property by fraud. It does not follow that in order to constitute mail fraud the money or property would not have been obtained without the scheme. Here, once the representation agreements were executed, the players could only obtain scholarship money by fraudulently representing that they were eligible to play football.

■ Furthermore, a brand new deprivation occurred as a result of defendant's scheme: the colleges were deprived of their right to allocate athletic scholarships on the basis of truthful representations as to each player's eligibility. The right to control the allocation of athletic scholarships is a right protected by the mail fraud statute. *See U.S. v. Walters,* 711 F.Supp. 1435, 1445 (N.D.Ill 1989); *See also Carpenter v. U.S.,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). Defendant's motion to dismiss the indictment for failure to make out an offense under 18 U.S.C. § 1341 is denied.

### Defendant's Knowledge of False Statements

■ Defendant contends that the evidence produced during his first trial was insufficient to support a finding that he knew about the false statements which the athletes made to their respective colleges. Therefore, defendant maintains, his prosecution is now barred by the Double Jeopardy Clause of the Constitution.

Defendant misstates the rule of law to be applied on a motion to dismiss the indictment. Defendant's convictions were reversed due to trial error, not because the evidence was insufficient to support the verdict. Defendant, therefore, "can be retried even if the evidence introduced at trial would not have been sufficient to sustain his conviction but for the error—even if, in other words, the government will have to put in new evidence on retrial to convict him." *U.S. v. Holzer*, 840 F.2d 1343, 1349 (7th Cir.1988); *See Burks v. U.S.*, 437 U.S. 1, 16, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978) ("reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case.") In testing the sufficiency of the indictment at this stage, the court must only make certain that it "contains the elements of the offense charged and adequately informs the defendant of the specific charges against him...." *U.S. v. Brack*, 747 F.2d 1142, 1146 (7th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985).[3]

■ After examining the indictment, the court is persuaded that it adequately informs defendant of the charges against him. The surviving mail fraud counts in the indictment charge defendant with the intent to engage in a scheme to defraud the University of Michigan and Purdue University of money or property. Those counts also allege that, in order to execute the scheme, defendant "knowingly caused" the eligibility certificates to be delivered through the mails. Superceding Indictment, Counts II and V.

These counts spell out the charges and elements of the offense in considerable detail, and specifically allege that defendant possessed the "intent" to defraud the colleges of money or property. The counts are, therefore, sufficient to withstand defendant's motion to dismiss.

Defendant may be correct in his belief that the evidence likely to be advanced by the government at trial will be insufficient to support a guilty verdict. The court does not intimate a view on this issue one way or another; defendant may raise these concerns through a motion for directed verdict at trial. The indictment, however, is sufficient on its face. Defendant's motion to dismiss the indictment for failure to allege the requisite element of intent is denied.

### The "In Furtherance Of" Requirement

■ Finally, defendant argues that the indictment should be dismissed because the mailings were not made "in furtherance of" the scheme. In order for defendant to prevail on his motion, the court must believe that "there is no conceivable evidence that the government could produce at trial" to substantiate its allegation that the eligibility forms were mailed in furtherance of the scheme. *U.S. v. Castor*, 558 F.2d 379, 384–85 (7th Cir.1977), *cert. denied*, 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978).

The court is not without guidance on this question. Bloom argued this very point in a pre-trial motion to dismiss the indictment in Walters I. At that time Judge Marovich explained how the mailings could have been used to execute the alleged scheme:

> a jury could reasonably conclude that the mailings in this case are an essential part of the scheme because they facilitated concealment of the scheme. If the universities or the Big Ten Conference had been given truthful information on the forms, the universities could have terminated the student-athletes' football scholarships and prevented the athletes from playing with the team. Such an occur-

---

**3.** Although a new trial is not barred by the Double Jeopardy Clause, the parties could test the sufficiency of the evidence by submitting to a trial on stipulated facts.

rence could seriously affect a particular athlete's value to defendants.

*Walters,* 711 F.Supp. at 1440.

Defendant does not provide the court with any reason to believe that Judge Marovich's analysis is unsound. NCAA regulations did not prevent defendant's stable of players from signing contracts and foregoing their college eligibility for immediate entrance into the pro draft. Very few players, however, avail themselves of that opportunity. A player in his junior year of college is unlikely to have demonstrated the proven ability necessary to justify a lucrative professional contract. The fact that the players signed by defendant chose not to forego their senior year adds weight to this observation. If a player's prospect of signing such a contract was diminished because he was rendered ineligible to play intercollegiate football, defendant's commission under the representation agreement would be adversely effected. The players' misrepresentations concerning their eligibility were therefore "essential to the perpetration and concealment of the alleged fraud." *Id.* at 1441.

Furthermore, the government is not required to show that defendant actually intended to use the mails, only that their use was reasonably foreseeable. *See Pereira v. U.S.,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). The eligibility statements which the players were asked to sign were forms provided by the Big Ten. The regulations required the colleges to submit these forms to the Big Ten headquarters in Schaumburg, Illinois. From these facts a jury could certainly conclude that the use of the mails to effect the submission of the forms was reasonably foreseeable. Walters' motion to dismiss the indictment for failure to satisfy the "in furtherance of" requirement is therefore denied.

## CONCLUSION

Defendant's motion to dismiss the indictment is denied.

IT IS SO ORDERED.