UNITED STATES of America

v.

Carl W. CLEVELAND, Fred H. Goodson, Maria F. Goodson, Joe H. Morgan, Benjamin Bura Rayburn, Sr. aka "B.B. Sixty Rayburn" and Larry S. Bankston.

Criminal Action No. 96–207.

United States District Court,
E.D. Louisiana.

Jan. 14, 1997.

Anthony J. Marabella, Jr., Marabella & Moore, Baton Rouge, LA, for Carl W. Cleveland.

Marilyn Michele Fournet, Baton Rouge, LA, for Fred H. Goodson.

Katherine Wheeler, Steffes & MacMurdo, Baton Rouge, LA, James Michael Small, Law Offices of J. Michael Small, Alexandria, LA, for Maria F. Goodson.

Arthur A. Lemann, III, Arthur A. Lemann & Associates, New Orleans, LA, William R. Campbell, Jr., New Orleans, LA, Michael Seth Fawer, Smith, Jones & Fawer, New Orleans, LA, for Benjamin Bura Rayburn, Sr.

Christopher Mar Guidroz, Simon, Peragine, Smith & Redfearn, LLP, New Orleans, LA, George Shaddock, Pascagoula, MS, for Joe H. Morgan.

Karl J. Koch, Lewis O. Unglesby, Unglesby & Koch, Baton Rouge, LA, for Larry S. Bankston.

Ian Hipwell, U.S. Attorney's Office, Baton Rouge, LA, Robert J. Boitmann, U.S. Attorney's Office, New Orleans, LA, for U.S.

### ORDER AND REASONS

VANCE, District Judge.

## I. Introduction

This criminal case involves allegedly illegal activity in the video poker industry in Louisiana. The defendants are former Louisiana State Senators Benjamin ("B.B. Sixty") Rayburn and Larry S. Bankston; an attorney, Carl Cleveland; an accountant, Joe H. Morgan; and two alleged video poker entrepreneurs, Fred H. Goodson and his daughter, Maria F. Goodson.

The government charges each of the defendants with racketeering and racketeering conspiracy and charges various defendants with mail fraud, conducting an illegal gambling business, interstate communications in aid of racketeering, conspiracy to defraud the United States, filing of a false income tax return, false declaration under penalty of perjury, aiding and abetting false declaration under penalty of perjury, and money laundering. Defendant Fred Goodson ("Goodson") challenges certain counts of the indictment as predicated on constitutionally infirm criminal statutes and claims that other charges should be dismissed because a video poker license does not constitute the "money or property" needed to support a federal mail fraud conviction. For the reasons stated below, both of Goodson's motions are DENIED.

## II. Defendant Fred Goodson's Motion to Dismiss All Illegal Gambling Counts, All Money Laundering Counts, and All Racketeering Acts Predicated on Either Illegal Gambling or Money Laundering Counts

### A. Background: Commerce Clause Jurisprudence and *Lopez*

Defendant Fred Goodson moves to dismiss racketeering acts 1e, 2a, 2b, 2c, 2d, 2e, Count 7, and Counts 8 through 12 of the superseding indictment on the grounds that the criminal statutes on which these allegations are based, 18 U.S.C. § 1955 (conducting an illegal gambling enterprise), and 18 U.S.C. § 1956 (money laundering), are facially unconstitutional or, alternatively, that the application of these statutes to this case is unconstitutional in that it constitutes a violation of the Commerce Clause and the Tenth Amendment of the United States Constitution.

■ It is a fundamental principle of constitutional law that the federal courts are courts of limited jurisdiction and that federal criminal jurisdiction is limited to cases arising under the United States Constitution or federal law. *See* U.S. Const. Art. III, § 2. The Constitution specifically enumerates only five criminal activities.[1] All other federal crimes are the product of Congressional statutes. Congress, however, is not free to pass any criminal statute it deems appropriate. Rather, to pass constitutional muster, all federal criminal statutes must be passed pursuant to one of the specifically enumerated powers in the Constitution. Defendant attacks the constitutional validity of 18 U.S.C. § 1955 (conducting an illegal gambling enterprise) and 18 U.S.C. § 1956 (money laundering) by arguing that neither statute was passed pursuant to a specifically enumerated Congressional power. Defendant maintains that both statutes regulate activity that falls outside the scope of Congress' power to regulate interstate commerce under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.[2] The Fifth Circuit has already upheld both statutes in question under the Commerce Clause. *See United States v. Gallo*, 927 F.2d 815, 822 (5th Cir.1991) (recognizing the validity of 18 U.S.C. § 1956); *United States v. Harris*, 460 F.2d 1041, 1044 (5th Cir.1972) (upholding 18 U.S.C. § 1955). Defendant nevertheless argues that this Court should reconsider those

1. These enumerated crimes are counterfeiting, U.S. Const. Art. I § 8, cl. 6; piracy on the high seas, U.S. Const. Art. I § 8, cl. 10; treason, U.S. Const. Art III § 3, cl. 2; offenses against the law of nations, U.S. Const. Art. I, § 8, cl. 10; and offenses supporting impeachment, U.S. Const. Art. I § 3, cls. 6 and 7.

2. The Commerce Clause states that "[t]he Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." U.S. Const. art. I, § 8, cl. 3.

decisions in light of the United States Supreme Court's recent decision in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

In *Lopez*, the Supreme Court struck down the Gun Free School Zone Act ("the GFSZA"), a federal statute making it a crime to knowingly possess a firearm in a school zone, on the grounds that it exceeded the authority of Congress under the Commerce Clause. *Lopez* marked the first time since 1936 that the Supreme Court invalidated a federal statute under the Commerce Clause and clearly indicated a shift towards a more restrictive view of Congress' powers under the Commerce Clause than had been espoused in the past.[3]

The *Lopez* Court enumerated three categories of activity that Congress may regulate under its commerce power:

First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Lopez*, 514 U.S. at ———————, 115 S.Ct. at 1629–30 (internal citations omitted).

The Court found that the GFSZA did not meet either of the first two categories and thus could be upheld only if the statute regulated an activity that "substantially affected interstate commerce." *Id.* In this case, all parties agree that the activities regulated under the statutes in question—illegal gambling and money laundering—clearly do not fall under the first two *Lopez* categories. As in *Lopez*, the Court's Commerce Clause analysis is therefore confined to the third *Lopez* category and the application of the "substan-

tial effects" test. Defendant argues that neither illegal gambling nor money laundering has the requisite "substantial effect" on interstate commerce to permit federal regulation under the Commerce Clause after *Lopez*.

**B. Standard of Review**

Under *Lopez*, this Court must determine whether a rational basis exists for concluding that the activity to be regulated substantially affected interstate commerce. Chief Justice Rehnquist, in the majority opinion, stated:

In [*National Labor Relations Board v.*] *Jones & Laughlin Steel*, [301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893] [(1937)], the Court warned that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.' (citations omitted). Since that time, the Court has heeded that warning and undertaken to decide whether a rational basis existed for concluding that a regulated activity sufficiently affected interstate commerce.

*Lopez*, 514 U.S. at ———, 115 S.Ct. at 1629 (citing *Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264, 276–80, 101 S.Ct. 2352, 2360–62, 69 L.Ed.2d 1 (1981)).

Further, although the rational basis test was not new to the Court's Commerce Clause analysis, the Supreme Court applied the test with more rigor in *Lopez* than it had in the past. The *Lopez* Court did not, however, establish precise guidelines for determining whether an activity can be rationally found to have a substantial effect on interstate commerce. Rather, finding that the GFSZA did not regulate activity that substantially affect-

---

**3.** For the storied history of the Court's interpretation of the Commerce Clause, *see Lopez*, 514 U.S. ———————, 115 S.Ct. 1624, 1626–29; Laurence Tribe, *American Constitutional Law* § 5–4 to 5–7, at 305–13 (2d ed. 1988) (describing initial view that Commerce Clause powers were broad, giving way to a "formalistic" reading of the Commerce Clause, in turn giving way to a "virtually unbounded" reading of the Commerce Clause prior to *Lopez* ).

ed interstate commerce, the *Lopez* Court found three deficiencies in the statute. First, the GFSZA by its terms "ha[d] nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms" *Lopez*, 514 U.S. at —————, 115 S.Ct. at 1630–31. Second, the GFSZA "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at ———, 115 S.Ct. at 1631. Third, there were no express Congressional findings regarding the effects upon interstate commerce, and the arguments advanced in their absence would permit limitless assertions of federal power. *Id.* at ———, 115 S.Ct. at 1632.

While the Court found that the statute failed to satisfy all of these considerations, it did not assign the relative weights to be accorded each of these factors. It has been suggested that the Court left unclear, for example, whether a statute must satisfy all three of the *Lopez* considerations to be constitutional or whether it simply needs to satisfy one of them. *See United States v. Wall*, 92 F.3d 1444, 1460 (6th Cir.1996) (Boggs, J., concurring in part and dissenting in part) ("Because the GFSZA satisfied none of the three subparts, the Court did not have to face the[ ] question [of the relationship between the subparts]. But [this question] cannot be ignored."). The Fifth Circuit's post-*Lopez* decisions do not directly address this issue either.

### C. The Fifth Circuit's Post-*Lopez* Jurisprudence

Since *Lopez*, the Fifth Circuit has had two occasions to examine the validity of various federal criminal statutes in light of *Lopez*, and both times the Court has distinguished the statute at issue from the one struck down in *Lopez*. *See United States v. Rawls*, 85 F.3d 240, 242 (5th Cir.1996) (upholding 18 U.S.C. § 922(g), prohibiting possession by a felon of a firearm shipped in interstate com-

merce); *United States v. Coleman*, 78 F.3d 154, 158 (5th Cir.), *cert. denied*, — U.S. ———, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996) (upholding 18 U.S.C. § 2119, prohibiting carjacking); *see also United States v. Kuban*, 94 F.3d 971, 973 (5th Cir.1996) (upholding Section 922(g) by summarily citing *Rawls*).[4]

In *United States v. Coleman*, the Court clarified that the type of rational basis review required under *Lopez* is a deferential form of review. Citing *Lopez*, the *Coleman* Court held:

> In reviewing an act of Congress passed pursuant to the Commerce Clause, courts traditionally defer to Congress because '[t]he Commerce Clause grants Congress extensive power and ample discretion to determine its appropriate exercise.' *Lopez* 514 U.S. at ———, 115 S.Ct. at 1634 (Kennedy, J., concurring). The proper inquiry on review is 'whether a rational basis existed for [Congress] concluding that a regulated activity sufficiently affected interstate commerce.' *Id.* at ———, 115 S.Ct. at 1629.

*Coleman*, 78 F.3d at 157–58.

The *Coleman* Court went on to find the carjacking statute constitutional and distinguished it from the statute in *Lopez* because "the carjacking statute has none of the deficiencies noticed by the Supreme Court [in *Lopez*]—lack of any connection with commerce or economic enterprise, broadly defined; lack of a jurisdictional element; and lack of congressional findings on the nexus with interstate commerce." *Coleman*, 78 F.3d at 159.

In *United States v. Rawls*, the Fifth Circuit found 18 U.S.C. § 922(g), a federal statute prohibiting possession by a felon of a firearm shipped in interstate commerce, constitutional under the Commerce Clause. The Court in *Rawls* had the benefit of five other circuit court opinions on the same issue, each of which had concluded that Section 922(g) was constitutional under the Commerce Clause. In light of the extensive amount of

---

4. The Court notes that the Fifth Circuit had a third occasion to rule on the constitutionality of a federal criminal statute under the Commerce Clause post-*Lopez*. *See United States v. Kirk*, 70 F.3d 791, 795–96 (5th Cir.1995) (upholding 18 U.S.C. § 922(o), prohibiting the transfer or pos-

session of machine guns manufactured or illegally transferred after May 19, 1986). However, the decision in *Kirk* was recently vacated, and the case is presently pending before the en banc court. *See* 78 F.3d 160 (1996).

persuasive authority supporting the constitutionality of the statute, the Court declined to provide an exhaustive analysis of the issue. *See Rawls,* 85 F.3d at 242. The *Rawls* Court did, however, distinguish Section 922(g) from the GFSZA on the basis that Section 922(g) contained a jurisdictional element, which limited the regulated activity to possession of firearms that had previously traveled in interstate commerce. The Court held that "[c]entral to the Court's holding in *Lopez* was the fact that § 922(g) contained 'no jurisdictional element which would ensure, through a case-by-case inquiry, that the firearm possession in question affects interstate commerce.'" *Id.* (quoting *Lopez,* 514 U.S. at ——, 115 S.Ct. at 1631). Further, every case the Court cited in support of its ruling had justified the post-*Lopez* constitutionality of the statute on the existence of the statutory jurisdictional element. *See United States v. Sorrentino,* 72 F.3d 294, 296 (2d Cir.1995); *United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995); *United States v. Shelton,* 66 F.3d 991, 992 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1364, 134 L.Ed.2d 530 (1996); *United States v. Hanna,* 55 F.3d 1456, 1462 & n. 2 (9th Cir.1995); *United States v. Collins,* 61 F.3d 1379, 1383–84 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995); *United States v. Bolton,* 68 F.3d 396, 400 (10th Cir.1995), *cert denied,* —— U.S. ——, 116 S.Ct. 966, 133 L.Ed.2d 887 (1996). *Rawls'* emphasis on the centrality of the jurisdictional element and the case law it relies on suggest that the presence of a jurisdictional element permits a finding of constitutionality, without the need to address the other two *Lopez* considerations.

■ In summary, the relevant inquiry post-*Lopez,* is "whether a rational basis existed for [Congress] to conclude that a regulated activity sufficiently affected interstate commerce." *Coleman,* 78 F.3d at 157–58. The Court finds that this deferential standard can be met by a showing that the activity to be regulated satisfies any one of the *Lopez* considerations. This follows because each of the considerations appear to be sufficient to furnish the requisite nexus, *i.e.,* either the activity is connected with interstate commerce or an economic enterprise

(*i.e.,* the traditional turf of the Commerce Clause), or Congress requires a nexus with interstate commerce in each case to assert jurisdiction over the activity, or there are Congressional findings that support the conclusion that a rational basis existed for Congress to conclude that the activity in issue substantially affects interstate commerce. It would be redundant to require a separate jurisdictional statement if a case involves clear-cut commercial activity for which the nexus with interstate commerce is obvious. Alternatively, if Congress expressly requires an effect on interstate commerce in each case to assert jurisdiction over a particular activity, Congressional findings are redundant. Moreover, it is clear from the structure of the *Lopez* opinion that a statute need not satisfy all three considerations to be constitutional. There would have been no need to discuss the third consideration, for example, if failure to meet either one of the first two were sufficient to condemn the statute. Applying these principles, the Court will now examine the validity of each of the statutes in issue.

### D. The Validity of Section 1955 After *Lopez*

■ 18 U.S.C. § 1955 reads in pertinent part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both. (b) As used in this section—(1) "illegal gambling business" means a gambling business which— (I) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day. (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conduct-

ing lotteries, policy, bolita or numbers games, or selling chances therein.

18 U.S.C. § 1955.

Since the *Lopez* decision, one Circuit Court has reviewed the validity of 18 U.S.C. § 1955 under the Commerce Clause. In *United States v. Wall,* 92 F.3d 1444 (6th Cir.1996), the Sixth Circuit applied the *Lopez* substantial effects test and concluded that Section 1955 is constitutional because it is a regulation of an activity having a substantial relationship to interstate commerce. This Court agrees with that conclusion.

First, the Court notes, as did the *Wall* Court, that Section 1955, unlike the statute struck down in *Lopez,* has a commercial aspect to it:

> On its face, [Section 1955] has a commercial aspect. It does not prohibit gambling per se; rather, it punishes those who 'conduct[ ] ... an illegal gambling business.' 18 U.S.C. § 1955(a) (emphasis added). To sustain a conviction, Congress required federal prosecutors to demonstrate that a certain amount of commercial activity took place—the business had to 'remain[ ] in substantially continuous operation for a period in excess of thirty days or ha[ve] a gross revenue of $2,000 in any single day.' *Id.* § 1955(b)(1)(iii). Gambling itself, in its multiple forms, is a commercial activity.... By its terms, § 1955 is commercial in nature and is not favorably compared to possession of a gun in a school zone, which clearly does not involve commercial activity.

*Wall,* 92 F.3d at 1449.

It is true that the statute does not contain an explicit jurisdictional requirement. However, unlike the GFSZA, Section 1955 contains much legislative historical information to guide the Court in its determination of the reasonableness of Congress' conclusion that illegal gambling has a substantial effect on interstate commerce. Congress passed Section 1955 as part of Title VIII of the Organized Crime Control Act of 1970 in an attempt to attack sophisticated, large-scale illegal gambling operations, which Congress thought to be a major source of funding for organized crime. Congress made the following explicit findings regarding the effect of illegal gambling operations on interstate commerce:

> The Congress finds that (1) illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof; (2) illegal gambling is dependent upon facilities of interstate commerce for such purposes as obtaining odds, making and accepting bets, and laying off bets; (3) money derived from or used in illegal gambling moves in interstate commerce or is handled through the facilities thereof; (4) paraphernalia for use in illegal gambling moves in interstate commerce; and (5) illegal gambling enterprises are facilitated by the corruption and bribery of State and local officials or employees responsible for the execution or enforcement of criminal laws.

S.Rep. No. 91–617, 91st Cong., 1st Sess. 16 (1969).

Congress also "found that organized crime had developed complex channels through which ostensibly local gambling operations sent their revenues to central coffers." *United States v. Sacco,* 491 F.2d 995, 999 (9th Cir.1974) (citing President's Commission on Law Enforcement and Administration of Justice, Report: The Challenge of Crime in a Free Society 189 (1967) and Task Force Report: Crime and Its Impact—an Assessment 52–53 (1967)). Congress also concluded that large scale illegal gambling operations "distorted the production of goods for commerce and the flow of goods in interstate commerce." *Id.* (citing 116 Cong.Rec. 604 (1970) (remarks of Senator Allott), and 116 Cong. Rec. 35199 (1970) (remarks of Congressman St. Germain)). As the Fifth Circuit noted in *United States v. Harris,* "[t]he Congressional Record is filled with evidence to support the[se] conclusions...." *Harris,* 460 F.2d at 1045 and n. 3 (noting that in considering passage of the Organized Crime Control Act of 1970, Congress had before it the 1967 Report of President Johnson's Commission on Law Enforcement and the Administration of Justice).

Moreover, Congress's rationale offers a rational stopping point for the role of the federal government in regulating illegal gambling

activities. Mindful of the Tenth Amendment and the rights of the states, Congress made a point of not regulating all illegal gambling activity, but rather only large scale operations that were likely to have a substantial impact on interstate commerce. This was the reason that Congress drafted the statute so that it covered only gambling businesses that "involve[ ] five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business" and that have "been or remain[ed] in substantially continuous operation for a period in excess of thirty days or has gross revenue of $2,000 in any single day." 18 U.S.C. § 1955(b)(ii) and (iii). This intention is evidenced by the following statement from the legislative history of Section 1955:

> The intent of ... section 1955, below, is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions.... The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern, and those corrupt State and local officials who make it possible for them to function.

1970 U.S.Code Cong. and Admin.News 4007, 4029.

In light of this extensive record, this Court cannot find that Congress was unreasonable when it determined that gambling businesses of the type regulated by Section 1955 have a substantial effect on interstate commerce. Nor does the Court find that acceptance of Congress's reasoning would lead to boundless federal power. In fact, this Court finds that Section 1955 was the result of reasoned findings concerning the impact of *large-scale, continuous* gambling operations on interstate commerce. Accordingly, the Court finds Section 1955 facially constitutional.

■ The Court also finds the statute to be constitutional as applied in this case. The Court agrees entirely with the analysis of the Sixth Circuit's majority in *Wall*, which found that Section 1955 was constitutional as applied to defendants who owned and operated an illegal business that leased video poker machines to various establishments, all of which were in the state of Tennessee. Even if, as defendant Goodson claims, the defendants' alleged behavior were totally local in nature, the as-applied challenge in this case would fail for the same reason the *Wall* Court gave for rejecting the as-applied challenges in that case. As the *Wall* Court concluded:

> In the case at hand, there was no evidence that defendants were engaged in a gambling enterprise that filled organized crime coffers. This case appears to be one of those 'rare instances where a gambling operation meeting the requirements of 1955 will be a local operation, in no way connected with organized crime.' *Sacco*, 491 F.2d at 1000. **Congress, however, may regulate commercial activities that, although intrastate in nature, comprise a class of activities that substantially affect interstate commerce. Courts may not excise individual instances of a class of commercial activities that is within the reach of federal power.** *Perez v. United States*, 402 U.S. 146, 154, 91 S.Ct. 1357, 1361, 28 L.Ed.2d 686 (1971); *see also Lopez*, 514 U.S. at ——, 115 S.Ct. at 1630. *Maryland v. Wirtz*, 392 U.S. 183, 192–93, 88 S.Ct. 2017, 2021–22, 20 L.Ed.2d 1020 (1968); *Wickard v. Filburn*, 317 U.S. 111, 127–28, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942); *United States v. Pack*, 16 F.3d 1222, No. 92–3872, 1994 WL 19945 at *2 (6th Cir. Jan. 25, 1994) (per curiam) (**"If the class of activities is within the reach of federal power and the regulation imposed is reasonable, a court's investigation is concluded. There is no need for inquiry on a case-by-case basis or proof that a particular activity had a [substantial] effect on commerce."**) (quoting *Sacco*, 491 F.2d at 999); cf. [*United States v.*] *Gomez*, 87 F.3d [1093] at 1095–96 [ (9th Cir.1996) ] (noting that once the commercial nature of the activity is established, the courts must consider the aggregate effect of the activity on the commercial market).

*Wall,* 92 F.3d at 1450–51 n. 14 (emphasis added). *See also; Lopez,* 514 U.S. at ——, 115 S.Ct. at 1629 ("where a *general regulatory statute bears a substantial relation to commerce,* the *de minimis* character of individual instances arising under that statute is of no consequence.") (emphasis in original).

Moreover, the Court is not convinced by defendant's argument that the "evidence will not support any theory that the video poker business at issue ... engaged in any business which had even a minimal effect on interstate commerce." Record Doc. No. 65 at 17. If the government produces the evidence that it says it will, that evidence would show that defendant's alleged gambling business had significant interstate commercial aspects to it. Specifically, the government states that the evidence will show that: 1) the video poker machines essential to the operation were manufactured in another state; 2) the negotiations for the purchase of property for, and the construction of, future video poker locations involved interstate commerce; 3) the truck stop facility was required to have monthly fuel sales in an amount that implicates interstate commerce both as to the customers purchasing the fuel and the supplier providing the fuel; and 4) the truck stop facility was required to have a liquor license and restaurant facilities sufficient to handle a minimum of 50 persons and had agreements with national food suppliers to meet these requirements.

Accordingly, defendant Goodson's challenges to Section 1955 are rejected.

### E. The Validity of Section 1956 After *Lopez*

■ Defendant Fred Goodson concedes that the federal money laundering statute, 18 U.S.C. § 1956, is different from both the GFSZA and from Section 1955 in that by its express terms it limits application of the statute to certain transactions that affect interstate or foreign commerce "in any way or degree" or involve the use of a financial institution which is engaged in or affects interstate or foreign commerce "in any way or degree." 18 U.S.C. § 1956(c)(4)(A) and (B). Goodson submits that the presence of such a tenuous jurisdictional link between

the offense conduct and interstate commerce is insufficient to meet the requirements of *Lopez.* The Court disagrees.

■ As discussed above, the Fifth Circuit's post-*Lopez* jurisprudence demonstrates the critical significance of a statutorily required jurisdictional nexus to the statute's validity *vel non* under the Commerce Clause. *See Rawls,* 85 F.3d at 242 ("[central to the Court's holding in *Lopez* was the fact that § 922(q) contained 'no jurisdictional element which would ensure, through a case-by-case inquiry, that the firearm possession in question affects interstate commerce.' "). Further, the Supreme Court has held that the presence of even a tenuous jurisdictional nexus is to be read to invoke the full extent of Congress's Commerce Clause power. *See Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985). Thus, the Fifth Circuit, pre-*Lopez,* concluded that the minimal jurisdictional nexus requirement of Section 1956 was intended by Congress to invoke the full extent of Congress's power under the Commerce Clause. *See Gallo,* 927 F.2d at 822–23. The Court stated that:

> Section 1956 applies to conduct that 'in any way or degree affects interstate or foreign commerce.' 18 U.S.C. § 1956(c)(4). The legislative history of the Act indicates that this phrase was derived from the Hobbs Act, 18 U.S.C. § 1951, 'and is intended to reflect the full exercise of Congress's power under the Commerce Clause.' S.Rep. No. 433, 99th Cong.2d Sess. 13 (1986).

*Id.*

Other circuits have come to the same conclusion. *See, e.g., United States v. Peay,* 972 F.2d 71, 74 (4th Cir.1992) ("We ... hold that, in enacting § 1956, Congress intended to exercise the full legislative power conferred by the Commerce Clause.") Since Section 1956 is therefore to be interpreted to invoke the full extent of Congress' Commerce Clause powers, whatever they may be, the issue remains whether the defendant's alleged behavior had the requisite connection to interstate commerce for it to be constitutionally regulated under this statute. The Court finds that it had the requisite connection.

Defendant Fred Goodson is charged with five counts (i.e., Counts 8–12) of money laundering in violation of Section 1956. All of those counts involve one or more National Banks. Every financial institution involved is federally insured. *See United States v. Green*, 964 F.2d 365, 375 (5th Cir.1992) ("At oral argument [defendant's] counsel admitted he had never heard of a bank that did not affect interstate commerce in some way; NOR HAVE WE."). Two of the transactions (i.e., Counts 9 and 11) involve institutions in two different states: Louisiana and Mississippi. All of the counts involve the proceeds of an allegedly illegal gambling business, which, in this Court's view, implicated interstate commerce.

■ Finally, the Court notes that Section 1956 is also constitutional under Congress's power to collect taxes. *See United States v. Jensen*, 69 F.3d 906, 910 n. 5 (8th Cir.1995) ("In enacting the money laundering statute, Congress exercised its authority not only under the Commerce Clause, but also under its authority to collect taxes, duties, imposts and excises. The reasoning of *Lopez* does not apply."). The statute itself makes it illegal to knowingly "conduct or attempt[ ] to conduct ... a financial transaction which in fact involves the proceeds of specified unlawful activity—(A)(I) with the intent to promote the carrying on of specified unlawful activity; or (ii) *with intent to engage in conduct constituting a violation of section 7201 of the Internal Revenue Code of 1986 ...*." 18 U.S.C. § 1956 (emphasis added). The invocation of Section 7201 of the Internal Revenue Code is especially pertinent to this case, because all of the money laundering counts allegedly involve either conduct constituting an alleged violation of the Internal Revenue Code of 1986 (counts 8 and 9) or movement of the proceeds of those alleged Internal Revenue Code violations (counts 10 through 12). Congress is doubtlessly empowered to regulate such activity under both the Necessary and Proper Clause and Congress's taxing powers. Thus, while some money laundering cases might not implicate the part of the statute passed pursuant to Congress' taxing powers, this case clearly does.

Accordingly, Goodson's motion to dismiss Counts 8 through 12 of the indictment on the grounds that Section 1956 is both facially unconstitutional and unconstitutional as applied to this case is denied.

### III. Defendant Fred Goodson's Motion to Dismiss All Mail Fraud Counts and All Racketeering Acts Predicated on Mail Fraud

■ Defendant Fred Goodson moves this Court to dismiss Counts 3, 4, 5, and 6 and Racketeering Acts 1a, 1b, 1c, and 1d from the Indictment, all of which allege violations of 18 U.S.C. § 1341, the federal mail fraud statute. At issue is a question that has yet to be decided by the Fifth Circuit: whether video draw poker licenses constitute the "money or property" required to support a mail fraud conviction. After a consideration of the arguments presented by both parties and the relevant law, the Court finds that video poker licenses constitute property for purposes of the mail fraud statute. Accordingly, the Court denies defendant Fred Goodson's motion to dismiss the counts and racketeering acts that are predicated on mail fraud.

#### A. Background

The federal mail fraud statute, 18 U.S.C. § 1341, provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1341 (emphasis added).

Indictment counts 3 through 6 and racketeering Acts 1a, 1b, 1c, and 1d charge defendant Fred Goodson, and others,[5] with:

---

5. Counts 3 through 6 charge defendants Carl Cleveland, Fred Goodson, and Maria Goodson with mail fraud. Counts 5 and 6 also charge defendant Joe Morgan with mail fraud. Racketeering acts 1a, 1b, 1c, and 1d incorporate the acts alleged in counts 3, 4, 5, and 6, respectively.

knowingly and willfully devis[ing] and intend[ing] to devise a scheme and artifice to defraud, and to obtain property by means of false and fraudulent pretenses and representations; that is, to defraud the State of Louisiana and its citizens by fraudulently obtaining and renewing, through the submission of false and incomplete information, state licenses to operate video poker sites for Truck Stop Gaming, Ltd.

Superseding Indictment at 26.

Defendant Fred Goodson argues that these charges must be dismissed because state licenses to operate video poker sites do not constitute "property" for purposes of 18 U.S.C. § 1341. Defendant relies heavily upon the Supreme Court decisions in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

### B. Defining Property Under the Mail Fraud Statute

In *McNally*, the former chairman of the Kentucky Democratic Party orchestrated a scheme that steered state workman's compensation insurance contracts to an agency that agreed to share commissions with other insurance agencies specified by the former chairman. The trial court's jury instruction allowed for a conviction in the event that the jury found a scheme to defraud Kentucky and its citizens of the right to have the state's business conducted "honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud." *McNally*, 483 U.S. at 355 n. 4, 107 S.Ct. at 2878 n. 4. After a mail fraud conviction based on this instruction, the Supreme Court reversed, rejecting the application of the mail fraud statute to "schemes to defraud citizens of their intangible rights to honest and impartial government." *Id.*, 483 U.S. at 356, 107 S.Ct. at 2879. The Court held that the mail fraud "statute is limited in scope to the protection of property rights." *Id.*, 483 U.S. at 360, 107 S.Ct. at 2882. The Court

concluded that "any benefit which the Government derives from the statute must be limited to the Government's interests as a property holder." *Id.*, 483 U.S. at 358 n. 8, 107 S.Ct. at 2881 n. 8.

After *McNally*, the Supreme Court held in *Carpenter v. United States* that Section 1341 encompasses intangible property as well as tangible property. *Carpenter*, 484 U.S. at 25, 108 S.Ct. at 320. Specifically, the Court found that a scheme to take the Wall Street Journal's publication schedule and the contents of its "Heard on the Street" column constituted a scheme to take "property" under the mail fraud statute. *Id.*

Congress also acted shortly after the *McNally* decision to lessen its impact by enacting 18 U.S.C. § 1346, which extends the reach of the mail and wire fraud statutes to include "[any] scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. Defendant argues that the video poker licenses do not satisfy the mail fraud statute's property requirement under *McNally* and *Carpenter*, and that Section 1346 does not alter this result.[6] The Court finds that neither *McNally* nor *Carpenter* compels that conclusion because neither of them has anything to say on the specific issue of whether licenses constitute property.

Defendant also relies on a number of circuit court decisions that have held that state-issued licenses of various sorts are not property for purposes of Section 1341. *See United States v. Novod*, 927 F.2d 726, 728 (2d Cir.1991) (state dumping permit); *United States v. Schwartz*, 924 F.2d 410, 417–18 (2d Cir.1991) (arms export license); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir.1990) (school bus operator permit); *United States v. Kato*, 878 F.2d 267, 268–69 (9th Cir.1989) (pilot license); *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir.1989) (cab driver license); *United States v. Murphy*, 836 F.2d 248, 253–54 (6th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 307, 102 L.Ed.2d 325

---

**6.** It is true that the government does not rely on Section 1346 as a basis for criminal liability in the indictment, since it did not charge defendant with depriving another of the intangible right to honest services. The Court notes, however, that

Congress' action in passing Section 1346 demonstrates an intent to broaden the scope of what is considered property for purposes of the mail fraud statute.

(1988) (bingo license); *United States v. Dadanian,* 856 F.2d 1391, 1392 (9th Cir.1988) (gambling license). These decisions all state that a license achieves property status only when it is in the hands of the licensee—i.e., that a license is without value to the state and therefore is not property before it is issued. Moreover, each of these decisions finds that in issuing the licenses, the state acted as a regulator not a property owner. For example, in the *Schwartz* decision, the Second Circuit found that an arms export license did not constitute property for purposes of the mail fraud statute because the license was simply a means of regulating the private use of private property. The Court stated:

> The government's interest in issuing its licenses ancillary to its regulatory program is no different than its interests in propounding and enforcing its other regulations with broad based applications that do not include the issuance of licenses. Whether it chooses to use licenses or blanket rules, the government's purpose is to control the private use of private property. Thus, a regulatory license is nothing more than a formal embodiment of 'the necessary government approval.'

*Schwartz,* 924 F.2d at 417 (internal citation omitted). *See also Toulabi,* 875 F.2d at 125. ("From the government's perspective, however, the [taxi cab] license is a promise not to interfere rather than a sliver of property.... [This] is a regulatory rather than property interest.").

In response to the defendant's arguments, the Government points to three decisions—in the First Circuit, the Third Circuit, and the Eastern District of Louisiana—which hold that licenses constitute property for purposes of the mail fraud statute. *See United States v. Bucuvalas,* 970 F.2d 937 (1st Cir.1992); *United States v. Martinez,* 905 F.2d 709, 712–14 (3d Cir.1990); *United States v. Carollo,* 1995 WL 505461 (E.D.La. Aug. 22, 1995) (video poker licenses in Louisiana) (appeal pending). In *Martinez,* the Third Circuit found medical licenses to be property for purposes of the mail fraud statute. The Court rejected the argument that there is no loss of property by the state when it issues a license to someone in reliance on fraudulent information. The Court found no reason to draw an "esoteric distinction between an unissued and an issued license." *Martinez,* 905 F.2d at 715. The Court reasoned:

> This argument depends on the questionable statutory construction that someone who fraudulently acquires property that has great value once acquired, has not violated the mail fraud statute if the item acquired had no, or negligible, value in the hands of the victim. Nothing in the statutory language supports that theory. The statute, which proscribes 'obtaining money or property,' is broad enough to cover a scheme to defraud a victim of something that takes on value only in the hands of the acquirer as well as a scheme to defraud a victim of property valuable to the victim but valueless to the acquirer.

*Id.* at 713.

In *Bucuvalas,* the First Circuit likewise held that an entertainment and liquor license was property for the purposes of Section 1341. It was also unimpressed with the argument that the City's interest in the unissued licenses was not property:

> [G]iven the Court's expansive interpretation of the term 'property' in *Carpenter* ... we believe the municipal government's interest in these alcoholic beverage and entertainment licenses was in the nature of a 'property' interest within the meaning of *McNally* and *Carpenter.* In its broadest sense, a 'property' interest resides in the holder of any of the elements comprising the 'bundle of rights' essential to the use or disposition of tangible property or to the exercise or alienation of an intangible right. For instance, in *Carpenter* the defendant held a possessory interest in the wrongfully-disposed confidential information, while the Wall Street Journal retained the right to control the manner of its use, dissemination, and alienation. Similarly, the City of Boston had the right to control the issuance of these licenses, in order to assure their issuance to deserving licensees only.

*Bucuvalas,* 970 F.2d at 945 (internal citations omitted). The Court went on to add that even if the licenses did not become property

until they were issued, the city retained a right to control their alienation by the licensees, which was a property right, the deprivation of which could support a conviction for mail fraud. *Id.*

This Court agrees with the First and Third Circuit's conclusion that licenses constitute property even before they are issued. A distinction between an unissued and issued license belongs in the realm of metaphysics, not in a common sense application of the law. As one district court has held, "[t]o hold, as some courts have, that such valuable property vanishes when held in the hands of the issuer strikes the Court as preposterous." *United States v. Berg,* 710 F.Supp. 438, 444 (E.D.N.Y.1989) (internal citation omitted). The Court finds no reason to make distinctions of such pointless subtlety. The Court finds that video poker licenses are property and the challenged scheme deprived the state of its right to dispose of its property.

Further, although the Fifth Circuit has yet to rule on the matter, Fifth Circuit law strongly suggests that the strained distinction between issued and unissued licenses should be rejected. In *United States v. Loney,* 959 F.2d 1332 (5th Cir.1992), for example, the Court rejected an argument from the defendant that frequent flyer coupons do not constitute property for purposes of the federal fraud statutes. The Court in *Loney* rejected the defendant's argument, noting that "we construe 'property' in a broad sense for purposes of the federal fraud statutes." *Id.* at 1336. Noting that the *McNally* Court defined property as "things of value," *see McNally,* 483 U.S. at 358, 107 S.Ct. at 2881, the court concluded that frequent flyer coupons were clearly "something of value" because they could be used to obtain free flight tickets. *Id.* The court remarked that "[i]f such coupons did not represent something of value, one wonders why [the defendant] went to such trouble to obtain and sell them." *Id.* at 1336 n. 8.

The defendant's argument that video poker licenses are not property in the hands of the State because they only take on value after they are issued applies equally in the context of frequent flyer coupons. Frequent flyer coupons generally have little to no value to

the issuer and arguably take on value only after they are issued to a customer of the airlines. While the airlines cannot use the coupons themselves, the Fifth Circuit still found them to be property for purposes of the federal fraud statutes because they represent a "bundle of rights" that the airlines can dispose of as they see fit—the disposal of which significantly affects the airline financially. This Court finds no principled reason for making a distinction between issued and unissued licenses, especially when the Fifth Circuit has refused to make a distinction between issued and unissued frequent flyer coupons. Accordingly, *Loney* provides another rationale for rejecting defendant's argument.

Moreover, as one court has noted, "[t]he view ... that licenses are property in the hands of the licensees, but never in the hands of the government represents an inversion of historical fact." *United States v. Turoff,* 701 F.Supp. 981, 988 (E.D.N.Y.1988). As noted in a seminal article by Professor Charles Reich on the history of property rights, licenses and other forms of government largess were traditionally considered to be property that belonged to the state before it was given to private citizens:

> The chief obstacle to the creation of private rights in [government] largess [e.g., licenses, welfare benefits, services, contracts and franchises] has been the fact that it is originally public property, comes from the state, and made be withheld completely.

Charles Reich, The New Property, 73 *Yale L.J.* 733, 778 (1964). *See also Martinez,* 905 F.2d at 714; *Turoff,* 701 F.Supp. at 989–90 (Salutary fact that in modern times courts recognize property rights in licenses need not blind us to the fact that licenses originate in the state and are public property in the first instance.).

Furthermore, the Court finds that the facts of this case distinguish it from those cited by the defendant. As the government points out, the cases cited by the defendant focus on the State's lack of property interest in licenses solely involving the Government's exercise of a regulatory function. *See, e.g., Schwartz,* 924 F.2d at 417 ("The govern-

ment's interest in issuing its licenses ancillary to its regulatory program is no different than its interests in propounding and enforcing its other regulations with broad based applications that do not include the issuance of licenses."); *Toulabi*, 875 F.2d at 125 ("All the license signifies from the City's perspective is that the driver met the substantive criteria for the profession ... nothing more.... [This] is a regulatory rather than property interest."). Video poker is different, however, in that the State of Louisiana is more than just a mere regulator of the video poker industry and has much more of a direct financial interest in the video poker licenses than the government entities did in the cases cited by the defendant.

It is noteworthy that until recently, the business of video poker was illegal in Louisiana. One of the main reasons for the recent legalization of video poker was that it was considered an ongoing source of revenue for the State. Accordingly, Louisiana has set strict requirements to insure that the State receives its pro rata share of video poker receipts. Under the provisions of La.R.S. 33:4862.11(D)(2), for example, there is a 22.5% mandatory "franchise payment" of net video poker revenues that must be paid by all licensees into the "state treasury."[7] The State protects its interest in these revenues by 1) connecting each operating video poker machine to a central State computer in Baton Rouge, which records all of the money taken in and paid out in winnings; 2) issuing licenses only to people who meet certain qualifications; and 3) making such licenses nontransferable. The Court finds that, in light of the State's continued control over and considerable financial stake in the video poker industry, video poker licenses under Louisiana law are significantly different than the taxi cab driver's licenses, pilot licenses, state dumping licenses, bingo licenses, and arms trade licenses that were at issue in the cases cited by the defendant.

The case of *Borre v. United States*, 940 F.2d 215 (7th Cir.1991), is instructive. In *Borre*, the Seventh Circuit held that the government had a property interest in a cable television franchise in spite of the Seventh Circuit's earlier holding in *Toulabi*, 875 F.2d at 125, that taxi licenses do not constitute government property. In distinguishing a cable television franchise from the taxi licenses in *Toulabi*, the *Borre* court concluded that "a cable television franchise represents far more than a mere 'promise not to interfere' by the government." *Borre*, 940 F.2d at 221 (quoting *Toulabi*, 875 F.2d at 125). The same could be said of the video poker licenses involved in this case.

As the government points out, under Louisiana law, when the state awards a video poker license, it is functionally equivalent to awarding a franchise from which the State receives a significant percentage of revenue and over which it continues to exercise a great deal of control. In light of the State's continued financial interest in each video poker license it issues, these video poker licenses are substantially different from regulatory licenses and should be considered property because the state acts more as a property owner than as a "mere regulator."

In arguing that the state has no property interest in video poker licenses, the defendant also relies on La.R.S. 33:4862.1(D), which provides that:

Any [video poker] license applied for, granted, or issued under the provisions of this Part is a pure and absolute privilege.... Any license issued or renewed under the provisions of this Part is not property or a protected interest under the constitutions of either the United States or the state of Louisiana. La.R.S. 33:4862.1(D).

The Court does not agree with the defendant that this statute mandates a finding that the licenses are not property for purposes of the mail fraud statute. First, the Court notes that when determining whether something constitutes property for purposes of the federal fraud statutes, courts

---

7. The Court notes that the Louisiana Legislature's use of the term "franchise" is significant in light of Louisiana jurisprudence. Under Louisiana law, a franchise conferred by a government subdivision upon a private entity has been termed "a valuable property right." *Washington–St. Tammany Electric Cooperative, Inc. v. St. Tammany Parish Police Jury*, 612 So.2d 773, 777 (La.App. 1st Cir.1992), *writ denied*, 614 So.2d 86 (1993).

must look not only to state statutes, but also to "traditional property law." *See Martinez,* 905 F.2d at 713; *Carollo,* 1995 WL 505461 at *2. Under traditional property law, owners of licenses are generally considered to have a protective property interest. *Id.* (citing *Mackey v. Montrym,* 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979); *Beauchamp v. DeAbadia,* 779 F.2d 773, 775 (1st Cir.1985); *Keney v. Derbyshire,* 718 F.2d 352, 354 (10th Cir.1983); *Kudish v. Bradley,* 698 F.2d 59, 61 (1st Cir.1983)); *cf. In re National Cattle Congress, Inc.,* 179 B.R. 588, 593 (N.D. Iowa 1995) (dog racing license constitutes property of estate in bankruptcy), *appealed on other grounds,* 91 F.3d 1113 (8th Cir.1996); *In re Crescent City Capital Development Corp.,* No. 95–12735–B, 95–12736–B at 7–11 (E.D.La. Oct. 2, 1995) (riverboat gaming license constitutes property of estate in bankruptcy).

Moreover, the Court notes that the Supreme Court and the Fifth Circuit have both stated that property is to be interpreted broadly for purposes of the federal fraud statutes. *McNally,* 483 U.S. at 356, 107 S.Ct. at 2880 (citing *Durland v. United States,* 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896)); *Loney,* 959 F.2d at 1335–36.[8] That the Louisiana State Legislature has decided to deprive video poker licensees of a property interest in the context of 22:4862.1(D) does not mean that federal courts must apply that deprivation in all contexts. *Cf. Loney,* 959 F.2d at 1335–36 (recognizing that courts can construe things as property in one context but as not property in another). Congress could have expressly made the definition of property in Section 1341 completely dependent on state law definitions of property, but it chose not to do so. Consequently, the Court must look to traditional property law as well as state law in making its determination. Traditional property law clearly suggests that video poker licenses constitute property.

In any event, this Court concludes that the existence of La.R.S. 22:4862.1(D), if anything, hurts the defendant's position that the State has no property interest in the video poker licenses in that the statute is designed to limit the property rights of the licensees, so as to give the State a stronger interest in the licenses even after they are issued. In attempting to limit the property rights of video poker licensees through La.R.S. 22:4862.1(D), the State has made clear its intent to have video poker licensees act as if they were franchisees, thus protecting the State's significant financial interest in the industry. The statute reflects that the State wanted to keep to itself as much of an interest in the licenses as possible.

Finally, the Court rejects defendant Goodson's argument that federalism concerns are implicated by this motion. In short, since the Court finds that the video poker licenses in question are property for the purposes of Section 1341, the Court concludes that this is not "an unwarranted intrusion by the federal government into the conduct of state affairs," as defendant describes it. Record Doc. No. 66 at 16. Nor are comity concerns significantly implicated here because this interpretation of the mail fraud statute does not criminalize conduct that would otherwise be legal under state law. *See* La.R.S. 27:309(A) (providing criminal penalties for false statements intentionally made on video poker license applications).

The Court finds that the mail fraud charges in the superseding indictment are not facially invalid, as defendant suggests, and denies defendant Fred Goodson's motion to dismiss all mail fraud counts and to dismiss all racketeering acts alleging mail fraud violations. Accordingly,

IT IS ORDERED that defendant Goodson's motion to dismiss racketeering acts 1a, 1b, 1c, 1d and Counts 3, 4, 5, and 7 is hereby DENIED.

IT IS FURTHER ORDERED that defendant Goodson's motion to dismiss racketeering acts 2a, 2b, 2c, 2d, 2e and Counts 7, 8, 9, 10, 11, and 12 is hereby DENIED.

---

8. As noted above, Congress, in passing 18 U.S.C. § 1346, also expressed its desire that courts should interpret property broadly for purposes of the federal fraud statutes. See note 6, *supra,* and accompanying text.